**CITY OF OTTAWA, ILLINOIS; City of Marseilles, Illinois; Village of Naplate, Illinois; and City of Streator, Illinois, Plaintiffs,**

v.

**SAMMONS COMMUNICATIONS, INC. and Sammons Communications of Illinois, Inc., Defendants.**

**No. 87 C 1325.**

United States District Court, N.D. Illinois E.D.

Nov. 4, 1993.

---

John A. Hayner, Ottawa, IL, for City of Ottawa, Ill., City of Marseilles, Ill., Village of Naplate, Ill., City of Streator, Ill. and Village of Seneca, Ill.

Marshall John Schmitt, Michael E. Rigney, William Denby Heinz, Jenner & Block, Chicago, IL, for Sammons Communications, Inc. and Sammons Communications of Illinois, Inc.

Craig M. Armstrong, Armstrong & Surin, Ottawa, IL, for Arthur J. Kraus.

## OPINION AND ORDER

NORGLE, District Judge:

This matter having been tried before the court between June 10 and June 15, 1993, and after hearing the evidence and arguments at trial, the court enters the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52. Judgment is entered in favor of defendants and against plaintiffs on all remaining counts of the complaint for reasons set forth below.

**1.** To the extent any finding in this portion of the opinion is a conclusion of law, the court so deems it a conclusion of law.

## FINDINGS OF FACT [1]

1. The court conducted a bench trial on the remaining counts, I, III, V, and VII, which allege breaches of franchise contract provisions restricting cable television service rate increases. (Tr. at 1, 50, 237, 409; Sch. (a) at ¶ 12).[2]

2. Plaintiffs are four Illinois municipalities: the Cities of Ottawa ("Ottawa"), Marseilles ("Marseilles"), and Streator ("Streator"), and the Village of Naplate ("Naplate") (collectively "municipalities").

3. The municipalities are located in whole or in part in LaSalle County, Illinois. (Sch. (a) at ¶ 1).

4. The municipalities claim that defendants Sammons Communications of Illinois, Inc. ("Sammons of Illinois") and Sammons Communications, Inc. ("Sammons Communications") (collectively "defendants"), a cable television provider and its corporate parent respectively, breached certain franchise agreements by charging unreasonable rates for basic cable service. (Final Pretrial Order at 2; Cmplt. at 5–6, 11, 17–18, 22).

5. The defendants are Delaware corporations licensed to do business in Illinois. (Sch. (a) at ¶ 2).

6. On June 29, 1992 the court denied defendants' motion for summary judgment, which asserted that their franchises were deregulated between January 1987 and November 1988 by the Cable Communications Policy Act of 1984, 47 U.S.C. § 521 *et seq.* (the "Cable Act"). *City of Ottawa v. Sammons Communications, Inc.*, 795 F.Supp. 261, 262 (N.D.Ill.1992). The court held that the decision in *ACLU v. FCC*, 823 F.2d 1554 (D.C.Cir.1987), *cert. denied*, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988) applied retroactively and that, accordingly, the FCC regulations under which Sammons of Illinois was deregulated were void *ab initio*. *Sammons*, 795 F.Supp. at 265.

**2.** "Sch." shall refer to the schedules attached to the Final Pretrial Order filed on April 26, 1993. "Tr." shall refer to the trial transcript. Exhibits shall be cited as "PX" (plaintiffs') or "DX" (defendants').

7. Defendants further asserted that, in any event, the rates at issue were reasonable. (Sch. (i); Answer at 18–20).

8. It is thus agreed by the parties that the primary issue in this case is the reasonableness of Sammons of Illinois's rate increases after January 1987. (Sch. (b) at ¶¶ 2 & 3).

9. Pursuant to franchise agreements and ordinances, Sammons of Illinois provides cable services to subscribers who live in the municipalities. (Sch. (a) at ¶ 3).

10. Sammons Communications, which owns the stock of Sammons of Illinois, is not a party to the relevant franchise agreements and does not provide cable service in the municipalities. (PX 1 at 1; PX 3 at 1; 61 Television and Cable Factbook D–410, D–418, D–423 (Albert Warren ed. 1993); see Sch. (a) at ¶ 3).

11. Each franchise agreement or ordinance addresses Sammons of Illinois's authority to raise rates. (Sch. (a) at ¶ 5).

12. Each franchise agreement or ordinance also contains a separability clause providing that, if a provision of the franchise agreement is found to be inconsistent or at variance with any rule, regulation, or policy of the Federal Communications Commission ("FCC") or any other agency having jurisdiction, the remaining provisions of the agreement are still valid and binding upon the parties. (Sch. (a) at ¶ 6).

13. The franchise agreements were all entered into and the ordinances passed before December 29, 1984, the effective date of the Cable Act. (Sch. (a) at ¶ 4).

14. The Cable Act prohibited cable franchising authorities from regulating cable television service rates after December 29, 1986. 47 U.S.C. § 543(b), (c). Local regulation of cable service rates, however, was allowed in areas deemed "not subject to effective competition" as defined in regulations issued by the FCC. Id. at §§ 543(c), 557. Pursuant to the Cable Act, the FCC issued regulations which allow franchising authorities "to regulate rates for the provision of basic cable service in circumstances in which a cable system is not subject to effective competition." Id. at § 543(b)(1). (Sch. (a) at ¶ 7).

15. The Cable Act specifically provided that any provision of any franchise agreement that was inconsistent with the provisions of the Cable Act was preempted and superseded by federal law. Id. at § 556(c). (Sch. (a) at ¶ 8).

16. The Cable Act provided that any franchise agreement in effect on December 29, 1984 would remain in effect, subject to express provisions of the Cable Act, so that regardless of the effect of the Cable Act on rate provisions of a franchise agreement, each agreement was otherwise still valid and binding on the parties. 47 U.S.C. § 557. All the agreements in this case were in effect on December 29, 1984. (Sch. (a) at ¶ 9).

17. The Cable Act also provided that any request for an increase in regulated rates for which the franchising authority does not take action within 180 days shall be deemed granted. 47 U.S.C. § 543(d). (Sch. (1) at ¶ 9).

18. At all times relevant to this action, to the extent the municipalities were entitled to regulate Sammons of Illinois, 47 C.F.R. § 76.33 required the municipalities to solicit the views of interested parties, at least through written submissions, and issue a written statement regarding all decisions to regulate Sammons of Illinois. (Sch. (1) at ¶ 10).

19. To implement the Cable Act, the FCC amended its regulations in a report and order released April 19, 1985. Therein, the FCC listed each of the municipalities as being located within a franchise market with effective competition. Report and Order, 50 Fed.Reg. 18,637 (May 2, 1985); 47 C.F.R. §§ 76.33, 76.54 (1986). (Sch. (a) at ¶ 10).

20. Before January 1, 1987, Sammons of Illinois notified each of the municipalities and subscribers in the municipalities that it would raise its cable service rates as of that date. (Sch. (a) at ¶¶ 11, 19; Sch. (1) at ¶ 14; Tr. at 255).

21. The basic rate Sammons of Illinois charged in 1986 in the municipalities was $7.28 per month. After the Cable Act deregulated rates, Sammons of Illinois increased

its basic cable rate to $9.50, effective January 1, 1987. (Sch. (a) at ¶ 17).

22. On July 17, 1987, the United States Circuit Court of Appeals for the District of Columbia Circuit issued an opinion reviewing FCC regulations implementing the Cable Act. *ACLU*, 823 F.2d 1554. In that opinion, the court upheld most of the FCC regulations, but found that the signal availability standard the FCC used to determine whether an area was subject to "effective competition" was "arbitrary and capricious." *Id.* at 1572–73. The court remanded "that issue to the agency for a reasoned explanation of its chosen standard or the development of a new standard." *Id.* at 1573. (Sch. (a) at ¶ 13).

23. On September 28, 1987, the FCC released its *Further Notice of Proposed Rule Making* to revise the "signal availability standard" which it used to define effective competition, and invited comments from the public. *Further Notice of Proposed Rule Making*, 52 Fed.Reg. 36,802 (Oct. 1, 1987). (Sch. (a) at ¶ 14).

24. In announcing both the revision process and rule changes unrelated to signal availability, the FCC stated that "[a]part from these immediate amendments, we note that our existing rules remain in effect, as the court's decision in *ACLU* did not reverse them." (Sch. (a) at ¶ 15).

25. On April 29, 1988, the FCC released its *Second Report and Order* amending the signal availability standard. *Second Report and Order*, 53 Fed.Reg. 17,049 (May 13, 1988). Under the new standard, the municipalities were not considered to be areas subject to "effective competition." The FCC's amended regulations became effective October 29, 1988. *See id.* (Sch. (a) at ¶ 16).

26. The FCC delayed full implementation of the new rules for six months to provide "a sufficient amount of time for a cable operator to adapt to the onset of regulation as a consequence of changes made herein." (Sch. (1) at ¶ 8).

27. In 1988, before the FCC's amended signal availability standard took effect, Sammons of Illinois raised its basic monthly rate to $11.00. (Sch. (a) at ¶ 17).

28. The Cable Act provided that, in addition to any other rate increase which was subject to municipal approval, any rate subject to regulation could be increased at the discretion of the cable operator by an amount not to exceed 5% per year. 47 U.S.C. § 543(e)(1). (Sch. (1) at ¶ 17).

29. After October 30, 1988, Sammons of Illinois increased its basic cable rates by 5% or less, as permitted under the Cable Act. Sammons of Illinois's basic monthly cable rates were:

| Year | | Rate |
|---|---|---|
| 1989 | (starting November 1) | $11.55 |
| 1990 | (starting November 1) | $12.10 |
| 1991 | (starting May 1) | $12.70 |
| 1992 | | $13.30 |

At the time of trial, Sammons of Illinois's rate totaled $13.95. (Sch. (a) at ¶ 18; PXs 9–13; Sch. (1) at ¶ 20).

30. Since 1982, Sammons of Illinois has added nineteen channels to its service offerings. (Tr. at 243–44).

31. All of Sammons of Illinois's rate increases were announced by notice to the mayors of the municipalities and by issuance of a press release approximately thirty days before the effective date of the increase. (Sch. (a) at ¶ 19; Tr. at 255).

32. Subscribers received notice of all increases before they became effective. (Sch. (a) at ¶ 19; Tr. at 255; PX 9).

33. The municipalities did not conduct public hearings for any of the rate increases announced by Sammons of Illinois since 1986. (Sch. (a) at ¶ 20; Tr. at 256).

34. The municipalities called one witness in their case-in-chief, Jay C. Smith ("Smith").

35. Defendants called three witnesses, C. Cody Colquitt ("Colquitt"), Sandra K. Turley ("Turley") and Bruce N. Burnham ("Burnham").

36. Smith is a consultant to public agencies that regulate cable providers. Smith testified that the rates Sammons of Illinois charged in 1987, 1988, 1989, 1990, and 1991 were unreasonable because, based on his calculations, the rate of return on Sammons of Illinois's investment in each of those years exceeded what Smith considered reasonable. (Tr. at 5–136).

37. The court rejects Smith's opinion and finds that the preponderance of the evidence establishes that Sammons of Illinois's rates were reasonable.

38. Smith testified that he used "a utility cost of service method" to analyze the reasonableness of Sammons of Illinois's rates. The municipalities, however, "may not subject a cable system to regulation as a common carrier or utility." (*Compare* Tr. at 13–14 *with* 47 U.S.C. § 541(c)).

39. The municipalities contended at trial that Sammons of Illinois had used a rate of return analysis in the past to justify rate increases. The evidence on this point, however, established that Sammons of Illinois submitted rate of return information only because the City Council of Ottawa had requested it. Sammons of Illinois neither adopted nor endorsed a rate of return method. Moreover, to Turley's knowledge, Sammons of Illinois never used a rate of return analysis to set rates. (Tr. at 139–43, 248; PXs 23, 25).

40. Smith relied upon Sammons of Illinois's accounting data for the years 1987 through 1991. Smith did not consider data covering the time period before 1987. (Tr. at 12–13, 66, 128–29).

41. Smith particularly requested Sammons of Illinois's revenues and expenses for each municipality. Sammons of Illinois, however, records its revenues and expenses in the municipalities as part of the Ottawa Complex, which is a group of municipalities, including the plaintiff municipalities, that are served by common equipment and personnel. The municipalities in the complex are too small to justify building a cable network and supporting an administrative staff to serve each one separately. Instead, Sammons of Illinois designs the physical plant and hires administrative staff to serve a group of municipalities. In short, Sammons of Illinois administers the different franchises in the Ottawa Complex on a complex-wide basis because of economies of scale, ease of financial reporting, ease of sharing assets, and the geographical proximity of the communities. (Tr. at 174–75, 250–51).

42. When Smith learned that the data for the revenues and expenses for each municipality was unavailable, he requested that Sammons of Illinois allocate revenues and expenses to each municipality. Such allocations can be made by multiplying a given revenue or expense by a ratio that is an approximation of the municipality's share of that revenue or cost within the complex. In this case, Sammons of Illinois used two ratios, depending on what was being allocated: (a) the number of cable miles in each municipality compared to the total number of cable miles within the Ottawa Complex, or (b) the total revenue earned in each municipality compared to the total revenue earned in the entire complex. (Tr. at 131–32, 175; PX 14).

43. Although these allocations were not entirely arbitrary, they do not show a complete picture because of cross-subsidization. The cost of providing service is never the same for all subscribers. For example, in denser areas, less cable plant and fewer technicians per subscriber are necessary. Administratively, however, it is impractical to establish individualized rates for each subscriber. As a result, some subscribers, like those in denser areas, subsidize other subscribers, like those in more remote areas. The same effect occurs at a municipality level. The *per capita* cost of serving subscribers in Ottawa, which is denser and closer to Sammons of Illinois's transmission facilities and offices, is less than the cost of living in Marseilles. The allocation of revenues and expenses introduces artificial variances into the reasonableness analysis depending on the ratio used for the allocation and how that ratio is affected by items influencing the degree of cross-subsidization, like density of population. (Tr. at 196, 430).

44. Although Ottawa subscribers might pay more on a *per capita* basis, the economies of scale and lower administrative costs resulting from the sharing of facilities and staff lowers the overall costs to these subscribers. Accordingly, a balance must be struck between the economies of scale generated by aggregating municipalities into complexes and the disparities introduced among communities within a complex. The municipalities introduced no evidence to demon-

strate that Sammons of Illinois struck an unreasonable balance, or one that increased overall costs.

45. Colquitt's and Turley's testimony support the efficiency and reasonableness of administering service in the municipalities on a complex-wide basis. (Tr. at 196, 174–75, 250–51).

46. Colquitt is Sammons of Illinois's Controller. Colquitt testified that Smith's calculations distorted the financial data by ignoring earlier years in which Sammons of Illinois's return on its investment was minimal or even negative. (Tr. at 167–235).

47. Turley, Sammons of Illinois's Vice–President of Operations, testified that the rate increases at issue were justified by higher expenses in the municipalities and by improvements made to equipment and cable used to provide service in the municipalities. (Tr. at 239–56).

48. Burnham, a consultant in the cable industry, testified that the rates charged by Sammons of Illinois in 1987, 1988, 1989, 1990, and 1991 were lower than the national average of basic rates during those years. (Tr. at 256–94).

49. The court agrees with Sammons of Illinois's Controller, Colquitt, that, to measure Sammons of Illinois's return on investment, it is proper to use the accounting unit through which Sammons of Illinois tracks its own revenue and investment, the Ottawa Complex. Using this accounting unit eliminates the artificial distortions created by the allocation method of accounting. (Tr. at 133–34, 155–56, 173–74, 196–97).

50. Colquitt is a Certified Public Accountant and is qualified to testify on such matters. Smith is neither a Certified Public Accountant nor a Certified Financial Advisor. Smith does not possess an accounting degree. Smith's only formal accounting training was twelve hours of college classes attended some twenty-seven years ago. Smith also acknowledged at trial that he is not an auditor and that he does not perform financial auditing according to standards governed by the American Institute of Certified Public Accountants. Smith admitted he was not qualified to testify whether the allocations were consistent with generally accepted accounting principles. (Tr. at 155–56, 168–72, 181, 196–97, 398).

51. Once Smith obtained the allocated information, however, he introduced additional allocations based upon his own assumptions. He developed formulae and ratios to allocate revenues and expenses between basic service, the service at issue here, and premium service like HBO and Cinemax. (Tr. at 81–82; PXs 35, 38).

52. One of Smith's formulae understated the program expenses attributable to basic service. In rebuttal, Smith admitted that his allocation of these expenses understated those expenses for basic service, resulting in an overstatement of Sammons of Illinois's rate of return. Smith explained that he did not possess the actual data concerning expenses prior to his original calculations. Smith ultimately conceded, however that he did possess the actual data prior to his testimony and prior to the municipalities' offer of his original calculations into evidence. On May 29, 1993, before trial, Smith had prepared an alternative calculation using the data. When he testified on June 10, 1993, he presented an incomplete analysis. (Tr. at 82, 176–77, 305–06, 371–74; *compare* PX 38 *with* DX 9).

53. After allocating revenues and expenses to basic service, Smith estimated the rate of return earned by Sammons of Illinois for each year between 1987 and 1991. He estimated the rate of return on a static or stand-alone basis. In other words, he took each year separately and calculated the rate of return in that year. He then compared the allocated net income earned by Sammons of Illinois to the net income it would have earned had it earned what Smith considered to be a reasonable rate of return. (Tr. at 57–58; PXs 38, 40).

54. Smith used his static method even though he had used different methods in other cases to analyze rates. In particular, he had used what he called a dynamic or cash-flow method that analyzes the rate of return for an investment over the entire life of the investment. Smith admitted that, using this method, a cable company's return on

its investment will appear to be low or even negative in the early years of the investment. In his static model, however, Smith assumed a flat rate of return. He made no effort before his direct examination to reconstruct the information that would be necessary to do a cash-flow analysis. (Tr. at 58–59, 64–65, 128–30).

55. Smith opined that a reasonable annual rate of return for Sammons of Illinois for each year from 1987 to and including 1991 would have been between 10% and 15%. He based this opinion on what he called the weighted cost of capital. He said that a reasonable rate of return must be based on the return that was necessary to attract capital. This in turn is based upon the market value of debt and equity during the relevant time period. An investor's return on debt and return on equity would be weighted according to Sammons of Illinois's actual debt to equity ratio to determine a rate of return. (Tr. at 28).

56. Smith, however, admitted that he did not rely on Sammons of Illinois's actual debt-to-equity ratio when he settled on his 10% to 15% range of reasonableness. He used industry averages. (Tr. at 339).

57. Colquitt established that Sammons of Illinois had no debt. Accordingly, under Smith's cost of capital method, the annual reasonable rate of return for Sammons of Illinois for the years in question should have been 18% to 20%, the rate of return on equity during the relevant time period that Smith used to determine what rate he considered reasonable. (Tr. at 198–200).

58. For each municipality, Smith performed two calculations. First, he subtracted the revenue that would have been earned using a 10% rate of return "test" from what Smith estimated Sammons of Illinois actually earned in each municipality. Second, he deemed the amounts earned in excess of 10% to be unreasonable. He then repeated the process using a 15% rate of return test. (Tr. at 36–39; PXs 38, 40).

59. Colquitt opined that Smith's method suffered from two additional shortcomings that render it invalid. First, Smith ignored the life-cycle of Sammons of Illinois's cable system in the municipalities. Smith focused only on the period after 1986, even though Sammons of Illinois had rebuilt the system in 1982–84. He did not factor this large capital investment into his analysis. By ignoring these earlier years, Smith inflated the apparent rate of return. (Tr. at 67–72, 175–76).

60. These earlier years will not be excluded when judging whether Sammons of Illinois's rate of return in 1987–91 was reasonable. A cable system is a long-lived asset. Cable companies and investors analyze rates of return on such assets over their life-cycle. To do otherwise would disregard the reality that the costs of building or rebuilding a cable system are concentrated in the early years. The rate of return during these early years is typically low or even negative. Years after the investment, however, returns increase. The proper way to evaluate the reasonableness of rates is to incorporate into the analysis what happens in the earlier years. (Tr. at 58–59, 67–70, 175–76, 180–82; PXs 38, 40; DX 6).

61. Second, Smith disregarded the overall rate of return and, in doing so, never accounted for the time value of money. Not only are rates of return low or negative in the early years, but money earned in those earlier years is worth more than money earned in the later years. This principle should be incorporated into the analysis. Smith treated a dollar earned or lost in 1987 as equivalent to a dollar earned or lost in 1991 even though a dollar earned in 1987 can be invested and in 1991 be worth more than $1. By separating each year and disregarding the time value of money, Smith again inflated the overall rate of return by overemphasizing the returns in later years at the end of the life-cycle. (Tr. at 77–78, 177–78, 232–33).

62. Accordingly, the court rejects Smith's opinion that Sammons of Illinois's rates were unreasonable.

63. The evidence defendants adduced demonstrates that the rates were reasonable.

64. First, Colquitt prepared an analysis using complex-wide data. Colquitt used actual data from Sammons of Illinois's general ledger. Sammons of Illinois could reason-

ably determine its rates and could evaluate the reasonableness of its rates using this data. (Tr. at 179–81; DX 6).

65. Second, Colquitt adjusted for the programming expense used in Smith's initial calculations by using the actual programming expenses of basic service. (Tr. at 183–84; DX 6 at 3).

66. Third, Colquitt chose 1983 as the point from which to begin his analysis as opposed to Smith, who started with 1987. Colquitt chose 1983 based upon discussions with engineering personnel at Sammons of Illinois and financial data that showed a large investment in the Ottawa complex between 1982 and 1984. Colquitt had a reasonable basis to conclude that Sammons of Illinois rebuilt the complex during this period prompting the beginning of a new life-cycle. (Tr. at 182–83; DX at 3).

67. Finally, Colquitt corrected Smith's disregard of the time value of money by rating the various returns earned in each year by a discount factor. (Tr. at 184–91; DX 6 at 3).

68. Colquitt determined what annual rate of return earned each year from 1983 to 1992 would have produced for Sammons of Illinois the same amount of total income that it actually received in varying amounts over the course of those years. In other words, between 1983 and 1991, Sammons of Illinois's rate of return varied dramatically. The rate of return was low in the early years and higher in the later years. Using his discount calculation, Colquitt was able to determine the annual rate of return that would have produced the same total discounted income that Sammons of Illinois in fact earned during those years if Sammons of Illinois had earned in each of the individual years on a static or stand-alone basis. That rate was 11.85%, well within the 10% to 15% range that Smith testified was reasonable. (Tr. at 184–85, 188–90; DX 6 at 3).

69. Colquitt graphed the results of his analysis. This graph reveals that Sammons of Illinois's cumulative rate of return between 1983 and 1992 always has been at or below a level that Smith considered reasonable. The rate began at about 4%, declined to 3.15% over the next three years, and then rose to 11.85% by 1992. Between 1983 and 1990, Sammons of Illinois's rate of return was below 10% per year. Only in 1991 did Sammons of Illinois realize an overall rate of return of more than 10%. (Tr. at 191–92; DX 6 at 1).

70. Based on Colquitt's analysis, and assuming that Smith's 10% to 15% range was correct, Sammons of Illinois's rates over the period were reasonable. (Tr. at 200–01).

71. The municipalities contended that the earlier years were immaterial because Sammons of Illinois never asked the municipalities for rate increases to compensate for the lower rates of return. In 1987 and 1988, however, when the actual rates of return were being earned, it would have made no sense for Sammons of Illinois to apply for a rate increase. More importantly, the issue before the court is whether Sammons of Illinois's rates were reasonable overall. It is relevant to consider whether Sammons of Illinois's rates in the earlier years resulted in a rate of return below that which is a reasonable rate of return. (Sch. (e) at 1, ¶ 2; *id.* at 8, ¶ 1; Tr. at 249).

72. Colquitt's analysis therefore supports the reasonableness of Sammons of Illinois's rates. (Tr. at 178–94).

73. The municipalities attempted to resurrect their case by offering the rebuttal testimony of Smith, who used a life-cycle or dynamic analysis. The court rejects this analysis because it contains numerous deficiencies. (Tr. at 340–57, 361–70; PX 46).

74. First, as with his initial analysis, Smith allocated revenues and expenses to the various municipalities. (PX 46).

75. Second, Smith distorted the valuation of the system at the end of the life-cycle. According to Smith, a life-cycle analysis requires that the system be valued at the beginning and at the end of the life-cycle. Smith, however, used two different valuation methods. At the beginning, Smith used the "book" value of the system, namely, the value reflected in the accounting records of Sammons of Illinois, but at the end, he used what he described as a rule-of-thumb value based upon the net cash flow of the system in the

previous year. Had he used the same valuation technique in both instances, the rate of return that he calculated would have been lower. (Tr. at 388–90, 418, 421–22).

76. Third, Smith failed to recognize Sammons of Illinois's investment in the cable service system. He admitted that, in some of his life-cycle calculations, he used net investment, which inflated the rate of return. He also failed to account for a large investment in addressable converters described by Turley. (Tr. at 419–20).

77. Fourth, as he ultimately conceded on cross-examination, Smith disregarded recognized cost accounting authority by failing to account for working capital in his return calculation, again underestimating expenses and overestimating the rate of return. Until he was confronted with an authoritative source, Smith persisted in arguing that working capital had no place in the calculation. (*Compare* Tr. at 378–80 *with* Tr. at 411–14 and DX 15).

78. Further, Smith admitted that some of the numbers on the first page of PX 46, an analysis of ten-year return on investment, were incorrect. Despite repeated attempts, the municipalities were unable to establish precisely what effects these mistakes had on Smith's calculations. Accordingly, even if the court accepted Smith's method, his analysis was inconclusive. (Tr. at 424–27).

79. The rates that Sammons of Illinois actually charged for Marseilles and Naplate throughout the period resulted in a reasonable rate of return. Sammons of Illinois earned no more than a reasonable rate of return and thus did not breach its franchise agreements. (PX 40; ¶¶ 10–30).

80. Colquitt also prepared an alternative analysis in which he allocated revenues and expenses to individual municipalities. Colquitt attempted to account for Sammons of Illinois's actual programming expense, the cable system life-cycle, and the time value of money. This analysis showed an overall shortfall of approximately $1.9 million between what Sammons of Illinois actually earned and what a reasonable rate of return, as defined by Smith, would have produced. Although Ottawa showed a slight surplus, this surplus was overwhelmed by shortfalls in the other three municipalities due to cross-subsidization. (Tr. at 192–93; DX 7).

81. In judging the reasonableness of Sammons of Illinois's rates, the court finds that this large shortfall further supports the reasonableness of Sammons of Illinois's rates. Given the accounting realities associated with providing cable service to small municipalities, it was reasonable for Sammons of Illinois to establish rates that on a complex-wide basis resulted in a reasonable rate of return. (DX 7).

82. A host of other facts support the finding that Sammons of Illinois's rates were reasonable and that it complied with its franchise agreements. Turley testified at length about the budgeting process that Sammons of Illinois used to control costs and set competitive rates in the Ottawa Complex. Sammons of Illinois formulated its rates based on what neighboring systems charge their subscribers. Sammons of Illinois even conducted surveys of neighboring systems to ensure that Sammons of Illinois's rates were lower than the rates in nearby communities. Such pricing strategy demonstrates the reasonableness of Sammons of Illinois's rates. (Tr. at 241–46).

83. Turley also testified that Sammons of Illinois's expenses in the Ottawa Complex are relatively higher than in the other systems she oversees across the country. Turley explained that the high expenses are due to a strong labor union and Sammons of Illinois's commitment to use modern equipment in the complex. These factors further support the reasonableness of Sammons of Illinois's rates. (Tr. at 242–45).

84. Sammons of Illinois's rates were also low compared to national averages. Burnham testified to this fact which is supported by data from Paul Kagan's reference guide, which Smith recognized as authoritative. Sammons of Illinois's rates compared as follows:

| Year | Sammons Rate | National Average Rate |
|------|------|------|
| 1987 | $ 9.50 | $12.18 |
| 1988 | $11.00 | $13.86 |
| 1989 | $11.55 | $15.21 |
| 1990 | $12.10 | $16.78 |
| 1991 | $12.70 | $17.95 |

This comparison is even more favorable because the rates in 1988–91 all became effective on dates after January 1. This comparison further exemplifies the reasonableness of Sammons of Illinois's rates. (Tr. at 90–93, 281–83).

85. In sum, the rates Sammons of Illinois charged for basic cable service since 1986 have been in compliance with the Cable Act and the franchise agreements with each of the municipalities at all times. (Sch. (1) at 19, ¶ 25).

## CONCLUSIONS OF LAW

1. This court has original jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1337 in that the action arises under and is governed exclusively by the Cable Act, 47 U.S.C. § 521–59.

2. Venue in this district is proper under 28 U.S.C. § 1391(b). (Sch. (1) at ¶ 1).

3. The Cable Act prohibited municipalities from regulating cable television service rates after December 29, 1986. 47 U.S.C. §§ 521, 543(b), (c).

4. Under the Cable Act, the FCC was required to issue regulations "which authorize the franchising authority to regulate rates for the provision of basic cable service in circumstances in which a cable system is not subject to effective competition." 47 U.S.C. § 543(b)(1).

5. The Cable Act directed the FCC to review periodically its effective competition regulations to take into account developments in technology and to amend the regulations as necessary. 47 U.S.C. § 543(b)(3).

6. In its initial *Report and Order* announcing regulations to implement the Cable Act, the FCC determined that each of the municipalities was located within a market area with effective competition. *Report and Order*, FCC 85–179, adopted April 11, 1985, released April 19, 1985; *see* 50 Fed.Reg. 18637 (May 2, 1985); 47 C.F.R. §§ 76.33, 76.54 (1986).

7. In *ACLU v. FCC*, 823 F.2d 1554 (D.C.Cir.1987), *cert. denied*, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988), the Court of Appeals for the District of Columbia Circuit upheld most of the FCC implementing regulations, but found that the "signal availability standard" utilized by the FCC to define effective competition was "arbitrary and capricious." 823 F.2d at 1573. The Court remanded "that issue to the agency for a reasoned explanation of its chosen standard or the development of a new standard." *Id.*

8. Following the decision in *ACLU*, the FCC announced modification of the signal availability standard in its *Second Report and Order* released on April 29, 1988. *Second Report and Order*, 53 Fed.Reg. 17,049 (May 13, 1988). Under the modified FCC regulations, the municipalities were not considered areas with effective competition. The FCC delayed full implementation of the new rules for six months from the release date of the *Second Report and Order* to provide "a sufficient amount of time for a cable operator to adapt to the onset of regulation as a consequence of changes made herein." (Sch. (1) at ¶ 6).

9. Because the *ACLU* Court struck down the FCC regulations *ab initio*, cable rates in the municipalities were improperly deregulated. Also, the FCC regulations issued after the enactment of the Cable Act subjected Sammons of Illinois to rate regulation, effective October 29, 1988. *Sammons*, 795 F.Supp. at 265–66 (order denying summary judgment).

10. Even though Sammons of Illinois was subject to regulation, the municipalities' claims still fail as a matter of law.

11. In regulating Sammons of Illinois, the municipalities were obligated to comply with the following procedures, which they failed to do.

12. The FCC regulations implementing the Cable Act established administrative procedures by which a municipality could challenge an FCC determination that effective competition existed. 47 C.F.R. §§ 73.686, 76.7, 76.33 (1986). The municipalities never challenged the FCC's 1986 determination that Sammons of Illinois was subject to effective competition. (Sch. (1) at ¶ 14).

13. Under 47 C.F.R. § 76.33, franchising authorities that choose to regulate

the cable service industry must, among other things, allow an opportunity for interested parties to comment on the authority's decision to regulate or on the reasonableness of the cable rates. The municipalities failed to comply with 47 C.F.R. § 76.33: they never conducted public hearings and never solicited written comments. Therefore, the municipalities are barred from challenging the rates.

14. The municipalities failed to take final action within 180 days on any basic cable rate increase proposed by Sammons of Illinois since 1986; therefore, those increases are deemed granted as a matter of law under the Cable Act, 47 U.S.C. § 543(d).

15. Moreover, the court's finding that the cable systems in the municipalities were improperly deregulated allows inquiry into the reasonableness of Sammons of Illinois's rates during the period at issue. *See Ottawa v. Sammons*, 795 F.Supp. at 264.

16. The basic cable rates charged by Sammons of Illinois in the municipalities were reasonable and appropriate, thus no rebate or refund is necessary.

17. The franchise agreements for Ottawa and Streator explicitly provided that Sammons of Illinois was entitled to a 6% increase per year. PX 1 at 3, § 7; PX 3 at 4–5, § 7.

18. To the extent additional increases were subject to municipal approval, the court concludes that: (a) the municipalities failed to hold the necessary public hearings on Sammons of Illinois's rate increases, so they are deemed approved, and (b) the rate increases taken by Sammons of Illinois were reasonable, were consistent with the franchise agreements, and would have been approved. (47 U.S.C. §§ 541(c), 543(d); 47 C.F.R. §§ 76.33).

19. The rates were reasonable and no rebate to the municipalities is appropriate. The municipalities have failed to carry their burden to prove by the preponderance of the evidence that Sammons of Illinois breached its franchise agreements by charging excessive rates. To the contrary, the evidence at trial demonstrated that defendants complied with all applicable provisions of the franchise agreements or ordinances with the municipalities.

### CONCLUSION

For the foregoing reasons, judgment is entered in favor of the defendants Sammons Communications, Inc. and Sammons Communications of Illinois, Inc. and against the plaintiffs Cities of Ottawa, Marseilles, and Streator and the Village of Naplate as to counts I, III, V, and VII of the complaint.

IT IS SO ORDERED.